**HARTFORD FINANCIAL SYSTEMS, INC. and Martin Marietta Corporation, Plaintiffs,**

v.

**FLORIDA SOFTWARE SERVICES, INC., Florida Computer Service, Inc. and Depositors Trust Company, Defendants.**

Civ. No. 81–0184–P.

United States District Court,
D. Maine.

Nov. 2, 1982.

Gordon T. Walker, Boston, Mass., Michael T. Healy, Portland, Me., Edmund S. Muskie, Washington, D.C., Rose G. MacAulay, Vice Pres. Legal & Contracts, Bethesda, Md., for plaintiffs.

Frank Chapman, Augusta, Me., William Kayatta, Jr., Portland, Me., John Curtin, Jr., Boston, Mass., Timothy Askew, Jr., Atlanta, Ga., for defendants.

## MEMORANDUM DECISION AND ORDER

CYR, District Judge.

This diversity action for declaratory and injunctive relief was brought by Hartford Financial Systems, Inc. [Hartford] and by

Martin Marietta Corporation [Martin], Connecticut and Maryland corporations respectively. The defendants are Florida Software Services, Inc. [FSS], its wholly owned subsidiary Florida Computer Services, Inc. [FCS], both Florida corporations, and Depositors Trust Company [Depositors], a Maine corporation.

Depositors moved on July 31, 1981 to stay these proceedings pending arbitration. At the hearing held August 25, 1981, the plaintiffs and the Florida defendants advised the Court that they would not submit to arbitration unless compelled. Whereupon, Depositors brought a motion to compel arbitration by all parties to the present action.

## I

## FACTS

The pleadings, affidavits and documents submitted by the parties demonstrate the following undisputed facts.

On November 21, 1978, Depositors entered into a contract, entitled Resource Management Agreement [R.M.A.], with Financial Industry Systems [FIS], a Connecticut partnership with Hartford and Martin as sole general partners, calling for FIS to provide data processing services to Depositors for a period of six years. By its own terms the R.M.A. is to be "governed by, subject to, and construed according to the laws of the State of Maine," and the rights and obligations thereunder are rendered nonassignable by either party. (R.M.A. ¶¶ 18, 21.) The R.M.A. contains an arbitration clause, (R.M.A. ¶ 19) which provides, in part, as follows:

> Any controversy arising out of, or related to, this Agreement, or the transaction to which it relates, will be settled by arbitration conducted by a panel of three (3) arbitrators under the then-current rules of the American Arbitration Association, those arbitrators to be chosen from

a panel of persons supposed to be knowledgeable in data processing by computers.

Within a few months of the execution of the R.M.A., both parties expressed dissatisfaction with their contractual relationship. By letter dated July 18, 1980, Depositors asserted certain deficiencies in the services rendered by FIS. FIS promptly suggested renegotiation of the terms of the R.M.A.

On July 31, 1980 Hartford and Martin entered into an "Agreement to Enter Into Partnership" [Partnership Agreement] with defendant FSS, whereby FSS, Hartford and Martin were to form a limited partnership, "Martford", which would become a general partner in FIS; FSS would become the sole general partner in Martford; Hartford and Martin would become limited partners in Martford; and FSS would essentially become the sole general partner in FIS by virtue of its position as an individual partner in FIS and its position as the sole general partner in Martford, the only other "partner" in FIS.[1] Prior to making the agreed transfers, FSS assigned its interest in the Partnership Agreement to its wholly owned subsidiary, the defendant FCS. When all of these transfers were finally consummated on August 6, 1980, FIS consisted of FCS and Martford, which was, in turn, composed of FCS, Hartford, and Martin. As a result of the transfer by Hartford and Martin of their FIS partnership interests,[2] FCS obtained a 99.8% interest in FIS and Hartford and Martin each retained a .1% interest in FIS, as limited partners in Martford. The restructuring of FIS is diagramed in Appendix A.

Article VI of the Partnership Agreement provides for indemnification between Hartford and Martin on the one hand and FCS, as assignee of FSS, on the other, for costs and expenses incurred in connection with liabilities and obligations of FIS, depending

---

1. Although the precise legal relationship between Martford and FIS is neither clear nor critical to the resolution of the pending motions, it appears that Martford is essentially a subpartnership of FIS. *See* 59 Am.Jur.2d *Partnership* § 16 (1971).

2. A partner's interest in a partnership refers to his share of the profits and surplus of the partnership. Uniform Partnership Act § 26 [31 M.R.S.A. § 306].

on whether the liabilities and obligations arose before or after the closing of the Partnership Agreement.

An ancillary agreement among FIS, Hartford, Martin and FCS, the so-called Performance Agreement of July 31, 1980, entitles Hartford and Martin to investigate any customer claims of default by FIS in its performance under any service contract. Hartford and Martin were given the right to cure any FIS default and either to be reimbursed by FIS or to collect any amount due FIS from the customer.

Upon being informed of the intended transfers, Depositors declared its intention to continue to look to Hartford and Martin to ensure adequate performance by FIS under the R.M.A. Depositors, which viewed the restructuring of FIS as a maneuver by Hartford and Martin to divest themselves of their obligations under the R.M.A. by circumventing its anti-assignment clause, reiterated in letters of December 3, and December 19, 1980 that it would continue to look to Hartford and Martin for performance under the R.M.A.

In December, 1980, FIS began issuing invoices to Depositors for "supplemental expenses" under the R.M.A., including "supplemental services" rendered as far back as August 14, 1979, prior to the restructuring of FIS. Depositors refused to pay the invoices. As a result, on April 6, 1981 FIS declared Depositors in default and later notified Depositors that it was exercising its right to terminate the R.M.A. due to the failure of Depositors to satisfy the invoices.

On May 6, 1981, Depositors wrote to FIS, Hartford, and Martin advising that it considered the termination of the R.M.A. by FIS to be an "irreversible breach forcing [Depositors] to secure substitute services on or about May 31, 1981," and explaining that to demand continued performance by FIS would be "futile."[3] Depositors had been negotiating prior to this time and, on June 1, 1981, it entered into a contract with another data processing agency for substitute services.

On May 22, 1981, Depositors wrote to the chief executive officers of Hartford, and Martin, providing a copy to FIS, purporting to refer a number of its R.M.A. disputes with FIS to these officials as a prelude to a demand for arbitration. On May 29, 1981, Hartford and Martin instituted this action for declaratory and injunctive relief. On June 5, 1981, Hartford and Martin, considering themselves no longer obligated under the R.M.A., refused to recognize Depositors' referral of May 22 as proper compliance with the R.M.A. arbitration clause.[4] On June 24, 1981, Depositors again attempted a prearbitration referral, this time to the chief executive officer of FIS. On July 30, 1981, Depositors filed a written demand for arbitration with the American Arbitration Association (Appendix B), in response to which the plaintiffs and the Florida defendants moved, on August 19, 1981, for an order staying arbitration pending a determination of the proper parties and issues for arbitration, which motion was granted by an order of this Court entered August 26, 1981.

II

## MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

On July 31, 1981, Depositors renewed its previously denied motion to stay these judicial proceedings pending arbitration, thereby invoking those provisions of the Federal Arbitration Act which apply where there is "[a] written provision in . . . a contract evidencing a transaction in commerce [among the several states] to settle by arbitration a controversy thereafter arising out of such contract or transaction...." 9 U.S.C. § 2. There is no dispute that the R.M.A. involves transactions in interstate commerce.

Section 3 of the Act provides:

If any suit or proceeding be brought in any of the courts of the United States

---

**3.** Florida Deposition Exhibit 16.

**4.** The arbitration clause requires that arbitration await a 30-day referral "to the Chief Executive Officers of the parties." (R.M.A. ¶ 19.)

upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The requested stay must be granted provided the arbitration agreement covers the issues presented and Depositors is not in default in proceeding with arbitration.

Hartford and Martin argue that Depositors is estopped from arbitrating the R.M.A. disputes because (1) Depositors has "inflated" its damage claims for the alleged breaches by FIS, by seeking substitute services before demanding arbitration, thus precluding Hartford and Martin from taking any action to reconcile FIS and Depositors and avoid the need for substitute services; (2) Depositors did not seek arbitration when the disputed invoices were received; and (3) Depositors did not seek arbitration when FIS was restructured.

■ These arguments ignore the "effect of waiver" clause of the R.M.A., which provides that the "waiver or failure of either party to exercise in any respect any right provided for in this Agreement shall not be deemed a waiver of any further or future right hereunder." (R.M.A. ¶ 22.) Moreover, these arguments present defenses in the nature of mitigation of damages, laches, and estoppel, which are for arbitration. *In re Mercury Construction Corp.,* 656 F.2d 933, 940 (4th Cir.1981); *Halcon Internation-*

al, Inc. v. Monsanto Australia, Ltd.,* 446 F.2d 156, 160–163 (7th Cir.1971).[5]

Having determined that Depositors is not estopped from seeking a stay of these proceedings pending arbitration, it is necessary to examine the issues raised by the various claims in this action, to determine which, if any, are arbitrable. *See Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 616 (1st Cir.1975).

The complaint by Hartford and Martin seeks to enjoin Depositors from "consummating" any agreement for substitute services with any other data processing agency prior to arbitration of the rights and obligations of the parties to the R.M.A. The complaint also demands that FSS and FCS be enjoined from refusing to provide data processing services to Depositors prior to its completion of binding arbitration.

Alternatively, the plaintiffs would have the Court declare whether: (a) any party has breached the RMA; (b) Hartford and Martin are entitled, under the Performance Agreement, to provide substitute services to Depositors and to be reimbursed by FSS and FCS; (c) Depositors may obtain substitute services in response to the failure of FIS to perform under the R.M.A.; and (d) Hartford and Martin are liable for the additional cost of any such substitute services.

The Florida defendants, FSS and FCS, claim that by virtue of the Partnership Agreement Hartford and Martin are obligated to indemnify FSS and FCS for any liability or loss relating to Depositors' pending claims against FIS for breach of the R.M.A. These defendants also cross-claim against Depositors, asserting that it is indebted to "FIS and its partners" for various R.M.A. breaches.

**5.** The "waiver" asserted by Hartford and Martin is to be distinguished from the type of default which occurs when the party seeking arbitration actively participates in a lawsuit or otherwise acts inconsistently with its right to arbitrate. *See, e.g., E.C. Ernst, Inc. v. Manhattan Const. Co.,* 559 F.2d 268, 269 (5th Cir.1977); *Carolina Throwing Co. v. S & E Novelty Corp.,* 442 F.2d 329, 330 (4th Cir.1971). "[W]hether there is 'default' or 'waiver' in this sense is a question solely for the court to resolve." *In re*

*Mercury Const. Corp.,* 656 F.2d 933, 940 (4th Cir.1981).

Although Depositors has answered and counterclaimed in this matter, it has done so only after carefully noting that it was asserting its right to arbitrate the claims presented in this action. Finally, it cannot be said that Depositors, in obtaining substitute services, *after being notified that FIS was terminating the R.M.A.,* acted inconsistently with its right to arbitrate its disputes under the R.M.A.

Depositors, while specifically reserving its right to submit its counterclaim and cross-claim to arbitration, asserts that FIS has breached the R.M.A. and that Hartford, Martin, FCS and FSS are liable for the breaches as past or present general partners of FIS or as guarantors of performance by FIS under the R.M.A.

The claims of the parties fall into two general categories: (1) claims for breach of the R.M.A. and for consequential damages, and (2) claims by and among Hartford, Martin, and the Florida defendants for in-demnification under the Partnership Agree-ment and the plaintiffs' claimed right to intervene and cure under the Performance Agreement.

The presence of issues "referable to arbi-tration under an agreement in writing," 9 U.S.C. § 3, is clear. The arbitration clause covers "[a]ny controversy arising out of, or related to, this Agreement or the transac-tion to which it relates." (R.M.A. ¶ 19). The parties do not dispute that this clause is broad enough to cover all claims of breach under the R.M.A., and any damages flowing therefrom, presented in this action.[6] *See Acevedo Maldonado v. PPG Industries,* 514 F.2d 614, 616 (1st Cir.1975).

The indemnification claims asserted by Hartford, Martin, FSS, and FCS under their Partnership Agreement of July 31, 1980 are of a different nature. On their face these claims do not appear to arise out of the R.M.A., but out of the side agree-ments among the outgoing and incoming partners in FIS fixing their respective rights and responsibilities as original or new partners in FIS under its various contracts, including the R.M.A. The Partnership Agreement among Hartford, Martin and FCS, the latter as assignee of FSS, contains no arbitration clause and its indemnifica-tion provisions relate to reimbursement for "claims, liabilities, losses, costs or damages, and expenses" resulting from any breach by FIS. The Performance Agreement among Hartford, Martin and FIS, which entitles Hartford and Martin to investigate and cure customer claims of default on the part of FIS, likewise contains no arbitration clause.[7]

The Florida defendants protest that "[i]t will be virtually impossible for Martin, Hartford, FCS and FSS to defend them-selves or FIS in arbitration without a judi-cial determination as to . . . which of these parties are to control the arbitration and pay damages or awards resulting from the arbitration." Florida Defendants' Memo-randum of August 19, 1981, at 8.

Where a judicial proceeding poses both arbitrable and nonarbitrable issues, "the arbitrability of the arbitrable claim is not to be defeated or delayed because it is joined in the litigation with other issues not subject to arbitration." *In re Mercury Const. Corp.,* 656 F.2d 933, 940 (4th Cir. 1981) (*en banc*). The Supreme Court has commented on "the unmistakably clear con-gressional purpose that the arbitration pro-cedure, when selected by the parties to the contract, be speedy and not subject to delay in the courts." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).[8]

---

**6.** Although Hartford and Martin originally ar-gued that the arbitration clause only covers disputes relating to the nature and quality of services rendered under the R.M.A., that posi-tion was abandoned at oral argument.

 Among the assertedly "nonarbitrable" issues in this action, Hartford and Martin point to the dispute about whether Depositors was obligat-ed to seek arbitration before obtaining substi-tute services. But this is clearly a dispute "arising out of, or related to" the R.M.A. itself, that is, to the remedies for breach or termina-tion of the R.M.A.

**7.** Depositors is not a party to the Performance Agreement. Therefore, it cannot be main-tained, as Hartford and Martin seem to assert, that the Performance Agreement imposes any duty on *Depositors* to allow Hartford and Mar-tin to investigate and cure defaults by FIS prior to seeking substitute services. Whether the R.M.A. imposes such a duty on Depositors is, of course, an arbitrable issue.

**8.** A judicially created exception to the legisla-tive preference for arbitration is the so-called doctrine of "intertwining" or "permeation," which mandates that "when arbitrable and non-arbitrable claims are sufficiently inter-twined factually and legally . . . the district court should deny arbitration as to the arbitra-

The plaintiffs and the Florida defendants would have the Court stay arbitration of the clearly arbitrable claims in this action pending judicial resolution of the indemnification issues, which would be tantamount to a temporary injunction interfering with "proceedings in another forum." *A. & E. Plastik Pak Co. v. Monsanto Company,* 396 F.2d 710, 713 (9th Cir.1968). *See also Cowden Manufacturing Company v. Koratron Company, Inc.,* 422 F.2d 371 (6th Cir.1970). Although such an order might benefit the aforementioned parties,[9] it would result in a delay of Depositors' right, under the Federal Arbitration Act, to a speedy resolution of the arbitrable issues, *see Prima Paint v. Flood & Conklin,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967).

The presence in this action of both arbitrable and nonarbitrable claims raises the further question as to what, if any, judicial action should be taken with respect to the nonarbitrable indemnification claims pending arbitration of the arbitrable R.M.A. claims. Although 9 U.S.C. § 3 authorizes the stay of arbitrable claims only, the Court may stay the entire proceedings pending arbitration, by virtue of "the power inherent in every court to control the disposition of cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Harman Electrical Const. Co. v. Consolidated Engineering Co., Inc.,* 347 F.Supp. 392, 397–98 (D.Del.1972), *quoting Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936).

*See also Sibley v. Tandy Corp.,* 543 F.2d 540, 544 (5th Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *Janmort Leasing Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1293 (E.D.N.Y. 1979); *Black v. Econo-Car International, Inc.,* 404 F.Supp. 600, 602 (D.Mass.1975).

The relationship between these arbitrable and nonarbitrable claims warrants a stay of the entire action pending arbitration. The indemnification claims are predicated upon the liability of FIS to Depositors for alleged breaches of the R.M.A. Arbitration would involve consideration of any counterclaim by FIS alleging breaches by Depositors. Thus, the indemnification claims might well be mooted, in whole or in part, by the arbitration award. *Cf. Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (5th Cir.1979) [where nonarbitrable fraud and deceit claim would have been resolved by a decision on the arbitrable issue, entire proceeding would be stayed pending arbitration]; *Sibley v. Tandy Corp.,* 543 F.2d 540, 543–44 (5th Cir.1976) [where very existence of nonarbitrable securities claim was dependent upon adverse decision by arbitrators, entire action would be stayed pending arbitration], *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977).

The Court concludes that judicial economies and economies of time and effort for the litigants are best served by a stay of these proceedings pending arbitration.

ble claims and try all of the claims together in federal court." *Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 643 (7th Cir.1981). *See also Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 335 (5th Cir.1981); *Lee v. Ply*Gem Industries, Inc.,* 193 D.C.App. 112, 593 F.2d 1266, 1274–75, *cert. denied,* 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Applied Digital Technology, Inc. v. Continental Casualty Co.,* 576 F.2d 116, 117 (7th Cir.1978); *Sibley v. Tandy Corp.,* 543 F.2d 540 (5th Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). However, this doctrine has generally been applied where the nonarbitrable claim is one over which the federal court has exclusive jurisdiction, which would be defeated if the nonarbitrable federal claim such as an antitrust or securities claim, might be resolved, as a practical matter, by the collateral estoppel ef-

fect of the arbitration decision on the arbitrable claim. *See id.* The doctrine has no application where, as here, the nonarbitrable claim is based on state law. *See Dickenson v. Heinold Securities, Inc.,* 661 F.2d 638, 643 n. 11 (7th Cir.1981); *C. Itoh & Co. Inc. v. Jordan International Co.,* 552 F.2d 1228, 1231–32 (7th Cir.1977).

9. The indemnification provisions of the Partnership Agreement state that the indemnified party is to be held harmless for the costs and expenses arising out of any liability on the part of FIS. Since the reasonable costs and expenses of participation in the arbitration would appear to be recoverable from any party later held to be an indemnitor under the terms of the Partnership Agreement, these parties' claims of irreparable injury are flawed.

## III

## MOTION TO COMPEL ARBITRATION

Depositors moves, pursuant to 9 U.S.C. § 4, for an order compelling all parties in this action to arbitrate. Section 4 provides, in pertinent part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof....

"Whether a person is a party to [an] arbitration agreement ... is included within the statutory issue of 'the making of the arbitration agreement.'" *Interocean Shipping Co. v. National Shipping & Trading Co.,* 462 F.2d 673, 677 (2d Cir.1972). *See also McAllister Bros. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980). By asserting that they are not parties to the arbitration agreement the plaintiffs and the Florida defendants have placed "the making of the arbitration agreement" at issue.

### A. *Hartford and Martin*

The plaintiffs argue that, although they were the sole general partners in FIS at the time the R.M.A. was entered into, they were not signatories, and therefore only FIS itself can be compelled to arbitrate. The R.M.A. recites that the agreement is between Depositors and "Financial Industry Systems ('FIS'), a partnership of [Martin] and [Hartford]." The agreement is signed by Depositors and by the president of FIS.

Depositors argues that Hartford and Martin, as general partners in FIS at the time the R.M.A. was entered into, are bound by its provisions, including the arbitration clause.

It is clear that nonsignatories to a contract containing an arbitration clause may be deemed parties thereto, through ordinary contract and agency principles, for purposes of the Federal Arbitration Act. *See Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4 (2d Cir.1981); *In re Oil Spill by the "Amoco Cadiz",* 659 F.2d 789, 795–96 (7th Cir.1981); *McAllister Brothers, Inc. v. A & S Transportation Co.,* 621 F.2d 519, 523–24 (2d Cir.1980); *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied,* 423 U.S. 1054 (1976); *A/S Custodia v. Lessin International, Inc.,* 503 F.2d 318, 320 (2d Cir.1974) (*per curiam*); *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960); *Farkar Co. v. R.A. Hanson Disc., Ltd.,* 441 F.Supp. 841 (S.D.N.Y.1977), *rev'd on other grounds,* 583 F.2d 68, 71–72 (2d Cir.1978), *modified,* 604 F.2d 1 (2d Cir.1979); *Wells Fargo Bank v. London Steam-Ship Owners' Mutual Insurance Association, Ltd.,* 408 F.Supp. 626, 629 (S.D.N.Y.1976). Thus, a principal may enforce an arbitration agreement entered into between his agent and a third party, *see Interbras Cayman Co. v. Orient Victory Shipping Co., S.A., supra,* at 6–7, or be bound by such an agreement, *see A/S Custodia v. Lessin International, Inc., supra,* at 320. Other nonsignatories which may be bound by an arbitration agreement include insurance subrogees, *see Lumbermans Mutual Casualty Co. v. Borden Co.,* 268 F.Supp. 303, 313 (S.D.N.Y.1967), contract assignees, *see Fisser v. International Bank, supra,* 282 F.2d at 233, n. 6, and guarantors, *see Compania Espanola de Petroleos v. Nereus Shipping, S.A.,* 527 F.2d 966, 973–74 (2d Cir. 1975).

In determining who is bound by an arbitration agreement, federal courts look

to state-law contract principles. *See Farkar Co. v. R.A. Hanson Disc., Ltd., supra,* at 845; *Wells Fargo Bank v. London Steam-Ship Owners' Mutual Insurance Association, Ltd., supra,* at 628–30. Although the Court has discovered no Maine case law on point, the resolution of this issue is guided by basic common law principles of contract and partnership law and by the provisions of the Uniform Partnership Act, enacted by Maine in 1973.[10] P.L. 1973, ch. 377, 31 M.R.S.A. ch. 9 (1978).

■ Section 15 of the Uniform Partnership Act [U.P.A.] renders general partners jointly liable for "all debts and obligations of the partnership," other than those arising from tort or breach of trust. U.P.A. § 15 [31 M.R.S.A. § 295]. As joint obligors, each partner may insist that the other partners be joined in any action to enforce their joint obligation. *See Macomber v. Wright,* 35 Me. 156 (1852). *See also* 60 Am.Jur.2d *Partnership* § 325 (1972). Section 15 con-

forms with the common law view on partnership liability. *Id.* § 160.

The fact that FIS was the named party and the signatory to the R.M.A. does not preclude its enforcement against the individual FIS partners.[11] "Individuals may be bound contractually though not named in the contract but merely described by a trade or partnership or association name or otherwise."[12] 17 Am.Jur.2d *Contracts* § 295 at 712 (1964). *See Carroll v. Sparks,* 218 A.2d 517, 518 (D.C.1966); *Members of B. & C.W. Union v. Hall Baking Co.,* 320 Mass. 286, 69 N.E.2d 111 (1946).

Hartford and Martin have invited attention to no authority for excluding an *obligation to arbitrate* from the "debts and obligations" provision of U.P.A. § 15, and the only authority discovered by the Court is to the contrary. *See Application of Camhi,* 28 Misc. 93, 208 N.Y.S.2d 162 (Sup.Ct.1960), *rev'd on other grounds,* 13 A.D.2d 752, 215 N.Y.S.2d 406 (1961).[13]

10. FIS is a Connecticut partnership, but its liability under the R.M.A., a Maine contract, is governed by Maine law. 59 Am.Jur.2d *Partnership* § 8 (1971). It is further noted that Connecticut, like Maine, has adopted the U.P.A. C.G.S.A. §§ 34–39 to 34–82.

11. Hartford and Martin do not contend that the agreement to arbitrate was entered into by either partner without the authority of the other. The Uniform Partnership Act, section 9(3)(e) [31 M.R.S.A. § 289(5)], provides that "unless authorized by the other partner or unless they have abandoned the business, one or more but less than all the partners have no authority to . . . [s]ubmit a partnership claim or liability to arbitration or reference." The R.M.A. was entered into with full knowledge on the part of both general partners, by a partnership officer acting as their agent. Furthermore, by their acceptance of benefits under the contract, Hartford and Martin have ratified the R.M.A. *See Stein-Tex, Inc. v. Scappatillio,* 193 Misc. 402, 87 N.Y.S.2d 317 (Sup.Ct.1948), *modified on other grounds,* 275 A.D. 749, 88 N.Y.S.2d 270 (App.Div.1949); *Application of Camhi,* 28 Misc. 93, 208 N.Y.S.2d 162, 166 (Sup.Ct.1960), *rev'd on other grounds,* 13 A.D.2d 752, 215 N.Y.S.2d 406 (App.Div.1961).

12. It should be noted, however, that Hartford and Martin are in fact designated in the R.M.A. as general partners in FIS.

13. The Florida defendants assert that *Camhi* is distinguishable by virtue of a provision in the

*Camhi* contract stating that "members of the Association continue to be bound 'personally and individually' during the life of the Agreement," 208 N.Y.S. at 166. However, this clause was not considered dispositive of the question of *Camhi's* obligation to arbitrate. *See id.* The *Camhi* court concluded that even though Camhi's partner, not Camhi, signed the agreement with the Association, and even though the Association itself was the named party to the collective bargaining agreement with the union seeking arbitration, Camhi was obligated to arbitrate under general contract and partnership principles. *Id.* at 165–66.

Additionally, the Florida defendants cite *Beaunit Corp. v. Solarset Inc.,* 51 A.D.2d 926, 381 N.Y.S.2d 243 (App.Div. 1976), and *Eastern Parkway Medical Group v. Health Insurance Plan of Greater New York,* 136 N.Y.S.2d 443 (Sup.Ct.1954), for the proposition that a contractual obligation to arbitrate is enforceable only against the partnership entity and not against the individual partners. The *Beaunit* court held, without citation of authority and based on a stipulation of the parties, that the individual members of the partnership in that case "did not, other than as a partnership, agree to arbitrate, and . . . to the extent any claims are asserted against him . . . they should be deemed excluded from the consolidated arbitration." *Id.* 381 N.Y.S.2d at 244. *Eastern Parkway* held that an individual partner could not bring an action, in his own right, to compel a third party to arbitrate. The hold-

Any assertion that U.P.A. § 15 applies to monetary obligations and not to performance obligations is belied by its reference to joint liability for "debts *and obligations*." (*Emphasis added*). *Cf. Miller v. Doughty*, 520 S.W.2d 586 (Tex.Civ.App.1975) [individual partner bound by partnership agreement to sell partnership interest]; *Maine Gas & Appliance, Inc. v. Morse Brothers Co.*, 259 A.2d 367, 369–71 (Me.1969) [clause in contract entered into by partnership, individually binds, at most, those who were partners at the time the contract was entered into, because particular statute of frauds governing particular type of agreement, i.e., 33 M.R.S.A. § 51(8), would prevent incoming partner from being bound].

At oral argument plaintiffs appeared to abandon some of their earlier contentions by conceding that as former general partners in FIS they would be obligated under the R.M.A. to arbitrate disputes with Depositors arising prior to the restructuring of FIS. Indeed, plaintiffs expressly contend that FCS, the sole general partner in FIS at the time the disputes with Depositors arose, is alone obligated to arbitrate those disputes. Although it is not at all clear that the present R.M.A. disputes "arose" after the restructuring of FIS,[14] the Court assumes that to be the case for purposes of the present discussion.

■ Examining the July and August, 1980 transactions among Hartford, Martin, FSS and FCS, it appears that Hartford and Martin ceased to be associated with the carrying on of the business of FIS, thus effecting a dissolution of FIS under section 29 of the U.P.A. [31 M.R.S.A. § 309].[15] Dissolution does not terminate the partnership with respect to its duty to fulfill existing contractual obligations, and "[a]n individual partner's liability in such a case will not be terminated except by performance of an agreement creating the liability, or by express or implied consent of the other contracting party that he need not perform." *Redman v. Walters*, 88 Cal.App.3d 448, 152 Cal.Rptr. 42, 44–45 (1979); U.P.A. § 36 [31 M.R.S.A. § 316].[16] *See also Detrio v. United States*, 264 F.2d 658, 661 (5th Cir.1959) (New York law); *Application of Camhi, supra*, 208 N.Y.S.2d at 165; *cf. Chase v. Vaughan*, 30 Me. 412 (1849).

Plaintiffs concede that Depositors, upon becoming informed in July, 1980 of the impending transfer of FIS partnership interests, stated that it would continue to look to the plaintiffs to ensure adequate performance by FIS under the R.M.A. Plaintiffs' Memorandum on Nonarbitrability of November 3, 1981, at 6. This conclusion is supported by other evidence as well. *See, e.g.*, Hazelton Deposition, at 67. Therefore, it cannot be found on the present record that Depositors agreed to discharge plaintiffs from their then-existing obligations under the R.M.A.

Similarly, the continued acceptance of services by Depositors from FIS cannot be

---

ing was based on the rule that a member of a partnership seeking to recover from a third party a debt due the partnership must bring an action in behalf and for the benefit of the partnership and may not recover upon such obligation individually. *Kirschbaum v. Merchants Bank of New York*, 272 A.D. 336, 71 N.Y.S.2d 79 (App.Div.1947). The rule of *Eastern Parkway* and *Kirschbaum*, concerning the *right* of an individual partner to recover a partnership debt, follows from the relationship of the partners *inter se* and has no application where the matter at issue, as in this case, is the liability of an individual partner to a third person for the obligations of the partnership.

14. Indeed, at least one of the disputed invoices which led FIS to "terminate" the *R.M.A.* was for "supplemental services" rendered by FIS prior to its restructuring.

15. U.P.A. § 29 provides: "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."

16. U.P.A. § 36 provides:

The dissolution of the partnership does not of itself discharge the existing liability of any partner.

A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business; and such agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business.

construed as an implicit agreement that FCS, rather than Hartford and Martin, would be liable for any breach by FIS of the R.M.A. On December 3, 1980, Depositors reaffirmed in writing to FIS, Hartford, Martin, and FCS, that it was looking to FIS, Hartford, and Martin for performance of the R.M.A. by FIS, and at no time before or after that time did Depositors indicate otherwise. (Thomas G. Pownell Stipulation.) Promptly after notification of the purported termination by FIS of the R.M.A., Depositors objected to the action, by letter dated May 6, 1981 directed to officers of FIS, Hartford, and Martin.

 The plaintiffs contend that their status as limited partners in FIS, at the time the disputes arose, precludes the Court from compelling them to arbitrate. It is clear that a limited partner, unlike a general partner, is generally not liable for partnership obligations, Uniform Limited Partnership Act [U.L.P.A.] § 7 [31 M.R.S.A. § 157], and that a limited partner is not a proper party to proceedings by or against the partnership, U.L.P.A. § 26 [31 M.R.S.A. § 176]. But Depositors does not seek to compel plaintiffs to arbitrate by virtue of their present status as limited partners. Rather, Depositors asserts that, as general partners in FIS *at the time the R.M.A. was entered into,* Hartford and Martin remain obligated to arbitrate all disputes arising under the R.M.A. The plaintiffs offer no authority for the proposition that a general partner can absolve itself of an existing partnership obligation by converting its relationship with the partnership into that of a limited partner, nor has the Court encountered any such authority. Indeed, plaintiffs' contention is contrary to the rule that a general partner which ceases to be associated with the carrying on of partnership business remains liable, unless otherwise agreed, for existing partnership obligations. U.P.A. §§ 29, 36 [31 M.R.S.A. §§ 309, 316]. For purposes of U.P.A. § 36 [31 M.R.S.A. § 316] the term "existing liability" refers to *all* partnership obligations, no matter their type and no matter when they mature, so

long as the obligations are *incurred* before dissolution of the partnership. 2 Z. Cavitch, *Business Organizations* § 34.02 (1982).

 By virtue of the transfers of their interests in FIS, and of their agreements with FCS, the assignee of FSS, plaintiffs argue that they were no longer able to control the operations of FIS so as to prevent the disputes giving rise to Depositors' demand for arbitration. Be that as it may, their liability to Depositors upon dissolution is governed by U.P.A. § 36 [31 M.R.S.A. § 316] and remains unaffected by either the Partnership Agreement or the Performance Agreement, *to which Depositors was not a party.*

In short, no legal basis exists for relieving either Hartford or Martin, the general partners in FIS at the time the R.M.A. was entered into, from the obligation to arbitrate disputes under the R.M.A.

**B. FCS**

 Although FCS was neither a signatory nor a partner in FIS at the time the R.M.A. was entered into, Depositors argues that FCS, as a present general partner in FIS, has become obligated to arbitrate. FCS argues, as did the plaintiffs prior to oral argument, that the obligation to arbitrate is enforceable only against the partnership itself and not against the individual partners. The Court has already disposed of this argument[17] on reasoning equally applicable to FCS.

Section 17 of the U.P.A. [31 M.R.S.A. § 297] provides:

A person admitted as a partner into an existing partnership is *liable* for all the obligations of the partnership arising before his admission *as though he had been a partner when such obligations were incurred,* except that this liability shall be satisfied only out of partnership property.

(*Emphasis added.*) *See also* U.P.A. § 41(7) [31 M.R.S.A. § 321]. The exception expressed in the last clause of section 17 is not a limitation on the *liability* of incoming partners, but a limitation on the extent of

17. *See* text accompanying note 13, *supra.*

any *recovery* which may be had by a third person from the incoming partners individually. *Robert Trent Jones, Inc. v. B–F Limited Partnership,* S.C., 279 S.E.2d 613 (1981). Thus, this exception has not been demonstrated as having any effect on the incoming partner's obligation to arbitrate.

FCS asserts that a partner, like an agent or a guarantor, is not bound by an agreement to arbitrate. Unlike an agent, a partner is jointly liable on all contractual obligations of the partnership. U.P.A. § 15 [31 M.R.S.A. § 295].[18] Unlike a guarantor, whose obligations, including the obligation to arbitrate, are secondary or collateral to those of the primary obligor, 38 Am.Jur.2d *Guaranty* §§ 3, 15 (1968), and are thus dependent on the terms of the guaranty, *compare Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966, 973–74 (2d Cir.1975), *with Taiwan Navigation Co. v. Seven Seas Merchants Corp.,* 172 F.Supp. 721, 722 (S.D.N.Y.1959), the joint obligation of a partner is based on the partnership agreement itself, *see Ruzicka v. Rager,* 305 N.Y. 191, 199, 111 N.E.2d 878, 882 (1953). Indeed, in Maine, which has heretofore followed the "aggregate" theory of partnership law, an action to enforce a partnership contract must be brought against the individual partners.[19] *See Macomber v. Wright,* 35 Me. 156, 157 (1852).

Although FCS concedes that FIS is obligated to arbitrate R.M.A. disputes, it argues that Depositors cannot seek recovery from the nonpartnership assets of FCS, *see* U.P.A. §§ 17, 41 [31 M.R.S.A. §§ 297, 321], and that to compel FCS to arbitrate "would accomplish nothing other than harassing [FCS]." Florida Defendants' Memorandum of November 2, 1981, at 9. FCS expresses concern that Depositors may "persuade an arbitrator to permit it to recover from [FCS's] individual assets." Florida Defendants' Memorandum of April 13, 1982, at 3. These contentions assume that the issue as to whether Depositors may satisfy any arbitration award out of the individual assets of FCS is nonarbitrable.

A challenge to an arbitration award as being beyond the scope of the arbitrators' authority may be raised in an action to vacate the award under 9 U.S.C. § 10. *See Mobil Oil v. Local 8–766,* 600 F.2d 322 (1st Cir.1979); *Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 164–68 (D.C.Cir.1981). Courts entertain challenges to the arbitrability of particular issues on motion to compel arbitration under 9 U.S.C. § 4. *Farkar Co. v. R.A. Hanson Disc., Ltd.,* 583 F.2d 68, 71–72 (2d Cir.1978), *rev'g* 441 F.Supp. 841 (S.D.N.Y.1977), *modified* 604 F.2d 1 (2d Cir.1979); *Necchi v. Necchi Sewing Machines Sales Corp.,* 348 F.2d 693, 695–697 (2d Cir.1965), *cert. denied,* 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966).

---

**18.** An agent who has disclosed his principal is not bound by an arbitration agreement entered into on behalf of the principal, M. Domke, *Commercial Arbitration* § 10.03 (1968), because the agent of a disclosed principal is not a party to the contract, W. Sell, *Agency* § 190 (1975).

**19.** There are two diametrically opposed theories on the nature of a partnership; the so-called "entity" theory and the "aggregate" theory.

The common law view is that a partnership is the aggregate of its individual partners, not a separate legal entity, and that "[n]o suit [may] be maintained in favor of or against a partnership in the partnership name. The persons composing it must sue and be sued and a judgment only can be rendered against them." *Macomber v. Wright,* 35 Me. 156, 157 (1852). "Recovery must be had against the individual interests of the partners in the partnership property and against their individual assets," 1 R. Field, V. McKusick & K. Wroth, *Maine Civil Practice* § 4.4, at 65 (2d ed. 1970), and, "while partners are not indispensable parties, only those partners who have been made parties . . . will be bound by a judgment," *id.*

The U.P.A. imports certain features of the "entity" theory, *see, e.g.,* U.P.A. §§ 6, 8, 10, 25 & 30; however, the U.P.A. continues to treat the partnership as an aggregate in some important respects, including the matter of the partners' liability for partnership acts and obligations, *see* U.P.A. § 15. The failure of the U.P.A. to deal explicitly with the matter has led to conflicting views as to its effect on the capacity of the partnership to sue and be sued. *See* 60 Am.Jur.2d *Partnership* § 323 (1972). The Maine Law Court has yet to rule whether the U.P.A. changes the Maine common law "aggregate" theory. *See Brooks Bros., Inc. v. Harris,* 432 A.2d 750, 750–51 n. 2 (Me.1981).

In *Farkar,* the party demanding arbitration was seeking actual and consequential damages, even though the contract specifically prohibited the recovery of such damages. 441 F.Supp. at 843. Although the Second Circuit eventually concluded that the claim could, nevertheless, be submitted to arbitration because the arbitrators might find the aforementioned damages clause unconscionable, 604 F.2d at 2, the court noted that parties cannot be compelled to arbitrate a claim which is "frivolous" in light of the terms of the contract. *Id.* In *Necchi,* the arbitration demand encompassed certain issues later held nonarbitrable by the Second Circuit, and the party resisting arbitration had sought a judicial declaration that those issues were nonarbitrable.

In the present case the demand filed by Depositors with the American Arbitration Association seeks arbitration against FIS and against Hartford, Martin, FCS and FSS, "as present or former general partners of FIS, who, in their capacity as present or former general partners, are bound by the contracts of FIS and responsible for its contractual obligations including the obligation to submit to arbitration disputes relating to the RMA." Appendix B. The disputes listed by Depositors in its demand for arbitration concern whether certain payments were due FIS by Depositors under the R.M.A. and whether FIS breached the R.M.A. in various ways. Depositors seeks monetary damages for the alleged breaches by FIS.

At present Depositors neither demands nor requires a determination as to the extent, if any, to which the individual assets of the FIS partners can be applied to satisfy any future judgment confirming any arbitration award in favor of Depositors.[20] Therefore, the Court need not now decide whether this is an arbitrable question. Should the arbitrators find that Depositors may satisfy its claim from nonpartnership assets of FCS, FCS would be entitled, under 9 U.S.C. § 10(d), to challenge the arbitration award as being beyond the scope of the arbitrators' authority. The present arbitration demand is brought against Hartford, Martin and FCS in their capacities as past and present general partners in FIS. FCS cannot entirely avoid arbitration on the basis of the possibility that a nonarbitrable issue may arise during the course of arbitration.[21]

In view of the fact that FCS is now the only general partner in FIS and that it holds a 99.8% interest in the partnership, Depositors' efforts to compel arbitration by FCS in its capacity as partner can hardly be considered "harassment." [22]

---

20. Generally, the individual assets of partners may be reached by a partnership creditor only in the absence of sufficient partnership assets. *See Gordon v. Texas Co.,* 119 Me. 49, 109 A. 368 (1920).

21. This is not to say that the fears of FCS are totally unfounded. Depositors "does not concede" that FCS's monetary liability is limited to its interest in partnership assets, but contends that this question "should be resolved through arbitration." Depositors' Memorandum of December 26, 1981, at 9 n. 2.

In the event that the pending submission identifying the subject matter for arbitration were to be changed to include a request for a determination as to the manner of satisfaction of any award in favor of Depositors, and should the arbitrators pass on this question, the partners would be free to challenge the arbitrators' authority to make such a determination by bringing a proceeding in state court, *see* 14 M.R.S.A. § 5938, or in this Court, *see* 9 U.S.C. § 10.

22. Additionally, it is noted that FCS, along with FSS, has filed a cross-claim in this action alleging breach of the R.M.A. by Depositors and seeking recovery of amounts due "FIS and its partners." But any interest these cross-claimants may have in the action for breach of contract is as partners in FIS.

> [A party] cannot rely on the contract when it works to their advantage, and repudiate it when it works to their disadvantage. To permit them to do so would do violence ... to the congressional purpose underlying the Federal Arbitration Act.

*Tepper Realty Co. v. Mosaic Tile Co.,* 259 F.Supp. 688, 692 (S.D.N.Y.1966) [defendant, asserted by plaintiffs to be alter ego of party named in contract, entitled to move for stay under 9 U.S.C. § 3]. *See also In re Oil Spill by the "Amoco Cadiz",* 659 F.2d 789, 795–96 (7th Cir.1981) [Plaintiff asserting claims against defendant based on agency relationship with co-plaintiff, which had contracted with defendant, is bound by arbitration agreement.]; *Hughes*

## C. FSS

Depositors seeks to compel arbitration by FSS, the parent corporation and alleged alter ego of FCS, holder of a 99.8% partnership interest in FIS.

 It is clear that the alter ego of a party to an arbitration agreement may be bound to arbitrate. *See Interocean Shipping Co. v. National Shipping and Trading Co.,* 523 F.2d 527, 539 (2d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Fisser v. International Bank,* 282 F.2d 231, 233–34 (2d Cir.1960); *United States Barite Corp. v. M.V. Haris,* 534 F.Supp. 328 (S.D.N.Y.1982); *Farkar Co. v. R.A. Hanson Disc., Ltd.,* 441 F.Supp. 841, 845–46 (S.D.N.Y.1977), *rev'd on other grounds,* 583 F.2d 68 (2d Cir.1978), *modified,* 604 F.2d 1 (2d Cir.1979). In determining whether to pierce the veil of a corporate subsidiary

> [s]uperficial indicia such as common offices and telephone numbers between corporate entities is (sic) not enough to show that one corporation is an alter ego of another.... More important are such factors as the degree of overlap of personnel, the amount of business discretion displayed by the alleged puppet corporation and whether the two entities deal with each other at arm's length.

*United States Barite Corp. v. M.V. Haris, supra,* 534 F.Supp. at 330 (citation omitted). It is also necessary to determine whether the requisite degree of parental corporate control was used to "perpetuate a fraud" against Depositors. *Interocean Shipping Co. v. National Shipping and Trading Co., supra,* 523 F.2d at 539; *Fisser v. International Bank, supra,* 282 F.2d at 238–40.

 There are genuine disputes as to facts critical to determining whether FSS is the alter ego of FCS as concerns the RMA and its arbitration clause. The "making of the arbitration agreement [by FSS]" is therefore placed in issue. *See* 9 U.S.C. § 4.

*Masonry v. Greater Clark County School Bldg.,* 659 F.2d 836, 838–39 (7th Cir.1981) [Where a contract claim is asserted against defendant as

Should Depositors continue to press its demand to compel FSS to arbitrate, trial would be required to determine if FSS is rendered a party to the arbitration agreement by virtue of its alleged alter ego relationship with FCS. *Id. See also Interbras Cayman Co. v. Orient Shipping Co., S.A.,* 663 F.2d 4 (2d Cir.1981); *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 676–78 (2d Cir.1972). Because a determination as to whether FSS is the alter ego of FCS is central to the question of whether FSS is a party to the arbitration agreement, trial should be held prior to arbitration, *see Hidrocarburos y Derivados, C.A. v. Lemos,* 453 F.Supp. 160, 176–77 (S.D.N.Y.1977), unless Depositors withdraws its motion to compel FSS to arbitrate or, by agreement of the parties, that determination is deferred pending arbitration, *see id.* at 175; *McAllister Bros. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980).

### VI

### CONCLUSION

For the aforementioned reasons, Depositors' motion to compel arbitration by Hartford, Martin, and FCS in their capacities as past and present general partners in FIS must be GRANTED.

Decision on the motion to compel FSS to arbitrate is reserved pending trial of the alter ego issue, which will be scheduled by the clerk unless, within 10 days of this order, Depositors' motion is withdrawn as to FSS. The order staying arbitration shall remain in effect pending resolution of this issue.

Depositors' motion to stay all other proceedings in this action pending arbitration is GRANTED.

It is SO ORDERED.

contract assignee, plaintiff is equitably estopped from denying that defendant is "party" to arbitration agreement.]

# APPENDIX A

A. <u>Original Structure of FIS</u>

```
 FIS
 ┌────────────────┴────────────────┐
 Martin Hartford
 (50%) (50%)
```

B. <u>Transfer (Stage I)</u>

```
 FIS
 ┌───────────┬───────────┴───────────────┐
 Hartford Martin FCS (Assignee of Martford
 (44.5%) (44.5%) FSS) Limited Partnership
 (1%) (10%)
 │
 MARTFORD
 FCS Hartford
 (General) (Limited)
 98% (1%)
 Martin
 (Limited)
 (1%)
```

C. <u>Transfer (Stage II)</u>

```
 FIS
 ┌────────────────┴────────────────┐
 FCS Martford
 (90%) (10%)
```

D. <u>Final Distribution of Interests in FIS</u>

| | |
|---|---|
| FCS: | 99.8% |
| Hartford: | .1% |
| Martin: | .1% |

## APPENDIX B

### DEMAND FOR ARBITRATION UNDER ADMINISTRATION OF THE AMERICAN ARBITRATION ASSOCIATION

TO: Financial Industry Systems
150 Windsor Street
Hartford, Connecticut 06115

Hartford Financial Systems, Inc.
777 Main Street
Hartford, Connecticut 06115

Martin Marietta Corporation
6801 Rockledge Drive
Bethesda, Maryland 20034

Florida Computer Services, Inc.
711 East Altamonte Drive
Altamonte Springs, Florida 32701

Florida Software Services,
Inc.
711 East Altamonte Drive
Altamonte Springs, Florida 32701

Hartford National Corporation
777 Main Street
Hartford, Connecticut 06115

---

Depositors Trust Company ("DTC"), a party to an arbitration agreement in a written Resource Management Agreement ("RMA"), dated as of November 21, 1978, providing for arbitration, hereby demands arbitration thereunder. The arbitration agreement in the RMA provides as follows:

any controversy arising out of, or related to, this Agreement, or the transaction to which it relates, will be settled by arbitration conducted by a panel of three (3) arbitrators under the then-current rules of the American Arbitration Association, those arbitrators to be chosen from a panel of persons supposed to be knowledgeable in data processing by computers. The arbitration will be held in Augusta, Maine. The award of the arbitrators will be final and binding on the parties and may be entered in any court having jurisdiction in the matter. However, the arbitration shall not be invoked by either party until the matter or matters in dispute or controversy have been referred to the chief executive officers of the parties and they have been unable to resolve such disputes or controversies within a period of thirty (30) days after such reference has been made.

Demand for arbitration is hereby made against Financial Industry Systems ("FIS") as the party named in the RMA. Demand is hereby made against Hartford Financial Systems, Inc. ("Hartford"), Martin Marietta Corporation ("Martin"), Florida Computer Services, Inc. ("FCS") and Florida Software Services, Inc. ("FFS") as present or former general partners of FIS, who, in their capacity as present or former general partners, are bound by the contracts of FIS and responsible for its contractual obligations, including the obligation to submit to arbitration disputes relating to the RMA. Demand is hereby made against Hartford National Corporation as the guarantor of Hartford's performance of its obligations as a general partner of FIS.

This demand is made more than thirty days after the disputes between the parties were referred, unsuccessfully, to the chief executive officers of DTC and FIS for attempted resolution.

### NATURE OF DISPUTE

The disputes to be resolved are as follows:

(1) Whether payment of each of the following FIS invoices, purportedly issued pursuant to the RMA was due under the RMA.

| Invoice No. | Date | Amount |
|---|---|---|
| 51488 | December 1, 1980 | $ 65,690.21 |
| 51508 | January 1, 1981 | 65,690.21 |
| 51530 | February 1, 1981 | 65,690.21 |
| 51537 | March 1, 1981 | 65,690.21 |
| 51560 | March 9, 1981 | 282,609.00 |
| 51561 | March 16, 1981 | 32,132.04 |
| 51568 | April 3, 1981 | 1,912.96 |
| 51578 | May 20, 1981 | 2,391.21 |
| 52096 | June 5, 1981 | 1,912.96 |
| AA1000 | July 17, 1981 | 10,318.89 |

(2) Whether FIS's purported termination of the RMA, effective June 1, 1981, and its refusal to provide any services under the RMA after that date constituted a breach of any express or implied covenant of the RMA, and, if so, the amount of damages recoverable by DTC as a result of such breach.

(3) Whether FIS, in breach of the RMA, failed to provide enhancement programming and to develop and install various software systems, and, if so, the amount of damages recoverable by DTC as a result of such breach.

(4) Whether FIS, in breach of the RMA, failed to process DTC's checks in a timely manner and, if so, the amount of damages recoverable by DTC as a result of such breach.

CLAIM OR RELIEF SOUGHT

DTC seeks the following relief:

(1) $6,300,000, for FIS's wrongful termination of the RMA.

(2) $500,000, representing the value of the enhancement programming and software systems which FIS failed to provide.

(3) An additional amount, as yet undetermined, for additional costs incurred by DTC as the result of FIS's failure to provide enhancement programming and software systems.

(4) An additional amount, as yet undetermined but believed to be approximately $500,000, for DTC's loss of use of funds as the result of FIS's failure to process checks in a timely manner.

(5) A ruling that all the disputed invoices are invalid, and DTC owes FIS nothing thereunder.

HEARING LOCALE REQUESTED

In accordance with the RMA, DTC requests that the arbitration be conducted in Augusta, Maine.

The parties named above are hereby notified that copies of this demand for arbitration are being filed with the American Arbitration Association at its Regional Office in Boston, Massachusetts, with the request that it commence arbitration. Under Section 7 of the Commercial Arbitration Rules, you may file an answering statement within seven days after notice from the Administrator.

Signed _____ Title _____

Name of Claimant: Depositors Trust Company
Address: 286 Water Street
 Augusta, Maine 04330

 Attention: Fredric Price,
 Vice President